IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JACQULYNE SHELTON | ) | CASE NO. |
| 408 ½ East Church Street | ) | |
| Marion, Ohio 43302 | ) | JUDGE: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT FOR DAMAGES** |
| | ) | **AND REINSTATEMENT** |
| DOLLAR TREE STORES, INC. | ) | |
| 774 State Route 61 | ) | **JURY DEMAND ENDORSED** |
| Marengo, Ohio 43334 | ) | **HEREIN** |
| | ) | |
| **Serve Also:** | ) | |
| DOLLAR TREE STORES, INC. | ) | |
| c/o Corporation Service Company | ) | |
| Registered Agent | ) | |
| 1160 Dublin Road, Suite 400 | ) | |
| Columbus, Ohio 43215 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| KARLA POWELL | ) | |
| 6946 Spruce Pine Drive | ) | |
| Columbus, Ohio 43235 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| AMBER HERTZ | ) | |
| c/o Dollar Tree Stores, Inc. | ) | |
| 774 State Route 61 | ) | |
| Marengo, Ohio 43334 | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, Jacquelyne Shelton, by and through undersigned counsel, states and avers the

following for the Complaint against the Defendants:

**PARTIES AND VENUE**

1. Shelton is a resident of the City of Marion, County of Marion, State of Ohio.

2. At all times herein, Shelton was acting in the course and scope of her employment.

3. Dollar Tree Stores, Inc. ("Dollar Tree") is a foreign corporation that does business at 774 State Route 61, Marengo, Ohio 43334.

4. Dollar Tree is, and at all times herein, was an employer within the meaning of R.C. § 4112.01 *et seq*.

5. Karla Powell is a resident of Ohio.

6. At all times herein, Powell was acting in the course and scope of her employment.

7. Powell was at all times hereinafter mentioned, an individual who was a manager and/or supervisor at Dollar Tree who acted directly or indirectly in the interest of Dollar Tree.

8. Amber Hertz is a resident of Ohio.

9. At all times herein, Hertz was acting in the course and scope of her employment.

10. Hertz was at all times hereinafter mentioned, an individual who was a manager and/or supervisor at Dollar Tree who acted directly or indirectly in the interest of Dollar Tree.

11. All of the material events alleged in this Complaint occurred in Marengo County, Ohio.

12. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that Shelton is alleging a Federal Law Claim under Title VII of the Civil Rights Act of 1964 ("Title VII"), 28 U.S.C. § 2000e., and The Family & Medical Leave Act ("FMLA"), 29 U.S.C § 2601, *et seq*.

13. This Court has supplemental jurisdiction over Shelton's state law claims pursuant to 28 U.S.C. § 1367 as Shelton's state law claims are so closely related to her federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

15. Within two years of the conduct alleged below, Shelton filed charges of race discrimination, disability discrimination, and retaliation with the Ohio Civil Rights Commission ("OCRC") against Dollar Tree (OCRC Charge No. COL71(000931)08212023) ("Charges of Discrimination").

16. Shelton dually filed her Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

17. On or about February 29, 2024, the OCRC issued a Notice of Right to Sue letter to Shelton regarding the Charges of Discrimination.

18. In accordance with R.C. § 4112.052(C)(2), the statute of limitations for filing claims under R.C. § 4112.01 *et seq.* was tolled during the period while Shelton's Charges of Discrimination remain pending with the OCRC.

19. Shelton has filed this Complaint within two years of the issuance of the Notice of Right to Sue letter.

20. Shelton has properly exhausted her administrative remedies pursuant to R.C. § 4112.052.

## **FACTS**

21. Shelton is a former employee of Dollar Tree.

22. Shelton was hired by Dollar Tree in or about August 2020.

23. Shelton was employed by Dollar Tree in the position of Equipment Driver.

24. Dollar Tree was, at all times hereinafter mentioned, engaged in commerce or in an industry or activity affecting commerce and employed 50 or more employees for each working day during each of 20 or more calendar work weeks in the current or preceding calendar year and therefore is an employer as defined in 29 U.S.C § 2611(4).

3

25. At all times relevant herein, Shelton was employed by Dollar Tree for at least 12 months and had at least 1,250 hours of service with Dollar Tree and therefore was an "eligible employee" under FMLA, as that term is defined in 29 U.S.C. § 2611(2)(A).

26. Shelton is African American.

27. Shelton suffers from Bipolar Disorder and Carpal Tunnel Syndrome (Shelton's "Disabilities").

28. Shelton's Disabilities are mental or psychological disorders, and specifically intellectual disabilities.

29. Shelton's Disabilities are diseases.

30. Shelton's Disabilities relate to an intellectual disability.

31. Shelton's Disabilities are physical impairments.

32. Shelton's Disabilities substantially limit one or more major life activities.

33. Shelton has a record of Shelton's Disabilities.

34. As a result of Shelton's Disabilities, Shelton is and was considered disabled within the meaning of R.C. § 4112.01(A)(13).

35. Shelton disclosed Shelton's Disabilities to Defendants.

36. In the alternative, Defendants perceived Shelton as being disabled.

37. In the alternative, the Defendants perceived that Shelton's Disabilities constituted mental impairments.

38. In the alternative, Defendants perceived Shelton's Disabilities to substantially impair one or more major life activities, including working.

39. Despite these actual or perceived disabling conditions, Shelton was still able to perform the essential functions of her job.

40. As a result of Shelton's Disabilities, Shelton sometimes has trouble moving her hands freely.

41. As a result of Shelton's Disabilities, Shelton sometimes has trouble gripping objects with her hands.

42. As a result of Shelton's Disabilities, Shelton sometimes experiences pain in her fingers, hands, and arms.

43. As a result of Shelton's Disabilities, Shelton sometimes experiences mood swings that affect the way she communicates and/or interacts with other people.

44. Throughout her employment with Dollar Tree, Shelton experienced discriminatory treatment from her supervisors on the basis of her Disabilities.

45. Throughout Shelton's employment with Dollar Tree, Dollar Tree took adverse actions against Shelton on the basis of her Disabilities.

46. During Shelton's employment with Dollar Tree, Shelton was told by Amber Hertz that Shelton had a reputation amongst her co-workers for being "rough around the edges" ("First Discriminatory Comment").

47. Hertz was Shelton's supervisor.

48. Hertz is not disabled.

49. Hertz is not African American.

50. When Hertz made the First Discriminatory Comment, she was expressing a view that was widely held amongst Shelton's co-workers.

51. The First Discriminatory Comment was based on Shelton's Disabilities.

52. The First Discriminatory Comment was based on Shelton's race.

53. The First Discriminatory Comment was unwanted by Shelton.

54. Shelton opposed the First Discriminatory Comment.

5

55. Shelton was embarrassed by the First Discriminatory Comment.

56. Shelton was offended by the First Discriminatory Comment.

57. A reasonable person would consider the First Discriminatory Comment to be offensive.

58. The First Discriminatory Comment was severe.

59. A reasonable person would consider the First Discriminatory Comment to be severe.

60. The First Discriminatory Comment was pervasive.

61. A reasonable person would consider the First Discriminatory Comment to be pervasive.

62. Dollar Tree has a Discrimination Policy.

63. The First Discriminatory Comment is a violation of the Discrimination Policy.

64. Alternatively, the First Discriminatory Comment is not a violation of the Discrimination Policy.

65. Dollar Tree has a Harassment Policy.

66. The First Discriminatory Comment violates the Harassment Policy.

67. Alternatively, the First Discriminatory Comment is not a violation of the Harassment Policy.

68. Alternatively, the First Discriminatory Comment is permitted by Defendants.

69. The First Discriminatory Comment constituted harassment.

70. The First Discriminatory Comment created a hostile work environment based on disability status.

71. The First Discriminatory Comment created a hostile work environment based on race.

72. The First Discriminatory Comment caused Shelton emotional distress.

73. The First Discriminatory Comment is intolerable in a civilized society.

74. Alternatively, Defendants believe that First Discriminatory Comment is tolerable in a civilized society.

75. In or about December 2022, Shelton received a disciplinary write-up accusing her of failing to meet Dollar Tree's productivity standards ("First Discriminatory Write-Up").

76. Before receiving the First Discriminatory Write-Up, Shelton had taken at least one day off work because of her Disabilities.

77. Before receiving the First Discriminatory Write-Up, Shelton's Disabilities were interfering with her ability to perform her job efficiently.

78. Before receiving the First Discriminatory Write-Up, Shelton informed Dollar Tree personnel that her Disabilities were interfering with her ability to perform her job efficiently.

79. Before giving Shelton the First Discriminatory Write-Up, Dollar Tree was aware that Shelton's Disabilities were causing her alleged lack of productivity.

80. The First Discriminatory Write-Up was based on Shelton's Disabilities.

81. The First Discriminatory Write-Up was based on Shelton's race.

82. The First Discriminatory Write-Up was unwanted by Shelton.

83. Shelton opposed the First Discriminatory Write-Up.

84. Shelton was embarrassed by the First Discriminatory Write-Up.

85. Shelton was offended by the First Discriminatory Write-Up.

86. A reasonable person would consider the First Discriminatory Write-Up to be offensive.

87. The First Discriminatory Write-Up was severe.

88. A reasonable person would consider the First Discriminatory Write-Up to be severe.

89. The First Discriminatory Write-Up was pervasive.

90. A reasonable person would consider the First Discriminatory Write-Up to be pervasive.

91. The First Discriminatory Write-Up is a violation of the Discrimination Policy.

92. Alternatively, the First Discriminatory Write-Up is not a violation of the Discrimination Policy.

93. The First Discriminatory Write-Up violates the Harassment Policy.

94. Alternatively, the First Discriminatory Write-Up is not a violation of the Harassment Policy.

95. Alternatively, the First Discriminatory Write-Up is permitted by Defendants.

96. The First Discriminatory Write-Up constituted harassment.

97. The First Discriminatory Write-Up constituted an adverse action.

98. The First Discriminatory Write-Up constituted an adverse employment action.

99. The First Discriminatory Write-Up created a hostile work environment based on disability status.

100. The First Discriminatory Write-Up created a hostile work environment based on race.

101. The First Discriminatory Write-Up caused Shelton emotional distress.

102. The First Discriminatory Write-Up is intolerable in a civilized society.

103. Alternatively, Defendants believe that First Discriminatory Write-Up is tolerable in a civilized society.

104. In or about March 2023, a spill occurred in the Dollar Tree facility while Shelton was working on the production line.

105. The spill involved large amounts of soap covering the floor where Shelton was working.

106. In response to the spill, Shelton pressed the line's "emergency stop" button so that she could clean the spill and continue her work safely.

107. Shelton pressed the emergency stop button six times in total.

108. After Shelton pressed the emergency stop button, she was confronted, yelled at, and sent home by William Last Name Unknown ("Emergency Stop Discipline").

109. William LNU was Shelton's supervisor.

110. William LNU is not disabled.

111. William LNU is not African American.

112. The Emergency Stop Discipline was based on Shelton's Disabilities.

113. The Emergency Stop Discipline was based on Shelton's race.

114. The Emergency Stop Discipline was unwanted by Shelton.

115. Shelton opposed the Emergency Stop Discipline.

116. Shelton was embarrassed by the Emergency Stop Discipline.

117. Shelton was offended by the Emergency Stop Discipline.

118. A reasonable person would consider the Emergency Stop Discipline to be offensive.

119. The Emergency Stop Discipline was severe.

120. A reasonable person would consider the Emergency Stop Discipline to be severe.

121. The Emergency Stop Discipline was pervasive.

122. A reasonable person would consider the Emergency Stop Discipline to be pervasive.

123. The Emergency Stop Discipline constituted harassment.

124. The Emergency Stop Discipline created a hostile work environment based on disability status.

125. The Emergency Stop Discipline created a hostile work environment based on race.

126. The Emergency Stop Discipline caused Shelton emotional distress.

127. The Emergency Stop Discipline is intolerable in a civilized society.

128. Alternatively, Defendants believe that Emergency Stop Discipline is tolerable in a civilized society.

129. The Emergency Stop Discipline exacerbated Shelton's Disabilities.

130. The Emergency Stop Discipline triggered Shelton's Bipolar Disorder and caused her to enter an excited emotional state.

131. During the Emergency Stop Discipline, Shelton explained and defended her actions to William LNU.

132. Following the Emergency Stop Discipline, Shelton reported William LNU's discriminatory behavior to Dollar Tree's Human Resources personnel ("First Report of Discrimination").

133. Dollar Tree has a policy of investigating significant workplace issues or events.

134. The First Report of Discrimination reported a significant workplace issue or event.

135. Pursuant to Dollar Tree's policies, the First Report of Discrimination should be investigated.

136. Alternatively, pursuant to Dollar Tree's policies, the First Report of Discrimination should not be investigated.

137. An investigation should include interviewing the complainant.

138. An investigation should include interviewing the subject of the complaint.

139. An investigation should include interviewing the subject of the reported discrimination.

140. An investigation should include interviewing witnesses to the reported discrimination.

141. An investigation should include getting a written statement from the complainant.

142. An investigation should include getting a written statement from the subject of the complaint.

143. An investigation should include getting a written statement from the subject of the reported discrimination.

144. In response to the First Report of Discrimination, Defendants did not interview Shelton.

145. In response to the First Report of Discrimination, Defendants did not interview William LNU.

146. In response to the First Report of Discrimination, Defendants did not interview any witnesses.

147. In response to the First Report of Discrimination, Defendants did not get a written statement from Shelton.

148. In response to the First Report of Discrimination, Defendants did not get a written statement from William LNU.

149. In response to the First Report of Discrimination, Defendants did not get a written statement from any witnesses.

150. In response to the First Report of Discrimination, Defendants conducted no investigation whatsoever.

151. By failing to investigate the First Report of Discrimination, Defendants ratified William LNU's conduct.

152. By failing to investigate the First Report of Discrimination, Defendants allowed William LNU's conduct to continue.

153. Failing to investigate the First Report of Discrimination is an adverse action.

154. Failing to investigate the First Report of Discrimination is an adverse employment action.

155. Defendants willfully failed to investigate the First Report of Discrimination.

156. Defendants intentionally failed to investigate the First Report of Discrimination.

157. In response to the First Report of Discrimination, Defendants did not correct the Emergency Stop Discipline.

158. In response to the First Report of Discrimination, Defendants did not tell Shelton why they declined to correct the Emergency Stop Discipline.

159. In response to the First Report of Discrimination, Dollar Tree issued a disciplinary write-up to Shelton ("Second Discriminatory Write-Up").

160. The Second Discriminatory Write-Up accused Shelton of engaging in "unprofessional behavior…towards her peers and managers."

161. The "unprofessional behavior" referred to in the Second Discriminatory Write-Up was behavior that Shelton engaged in after her Bipolar Disorder had been triggered by the Emergency Stop Discipline.

162. Shelton did not engage in "unprofessional behavior" during the Emergency Stop Discipline.

163. Alternatively, any "unprofessional behavior" that Shelton engaged in during the Emergency Stop Discipline is attributable to Shelton's Disabilities.

164. The Second Discriminatory Write-Up was based on Shelton's Disabilities.

165. The Second Discriminatory Write-Up was based on Shelton's race.

166. The Second Discriminatory Write-Up was unwanted by Shelton.

167. Shelton opposed the Second Discriminatory Write-Up.

168. Shelton was embarrassed by the Second Discriminatory Write-Up.

169. Shelton was offended by the Second Discriminatory Write-Up.

170. A reasonable person would consider the Second Discriminatory Write-Up to be offensive.

171. The Second Discriminatory Write-Up was severe.

172. A reasonable person would consider the Second Discriminatory Write-Up to be severe.

173. The Second Discriminatory Write-Up was pervasive.

174. A reasonable person would consider the Second Discriminatory Write-Up to be pervasive.

175. The Second Discriminatory Write-Up is a violation of the Discrimination Policy.

176. Alternatively, the Second Discriminatory Write-Up is not a violation of the Discrimination Policy.

177. The Second Discriminatory Write-Up violates the Harassment Policy.

178. Alternatively, the Second Discriminatory Write-Up is not a violation of the Harassment Policy.

179. Alternatively, the Second Discriminatory Write-Up is permitted by Defendants.

180. The Second Discriminatory Write-Up constituted harassment.

181. The Second Discriminatory Write-Up created a hostile work environment based on race.

182. The Second Discriminatory Write-Up caused Shelton emotional distress.

183. The Second Discriminatory Write-Up is intolerable in a civilized society.

184. Alternatively, Defendants believe that Second Discriminatory Write-Up is tolerable in a civilized society.

185. The Second Discriminatory Write-Up was retaliation for the First Report of Discrimination.

186. By giving Shelton the Second Discriminatory Write-Up, Defendants made it less likely for a reasonable employee to make a report or oppose conduct like the Emergency Stop Discipline.

187. The Second Discriminatory Write-Up constitutes retaliation.

188. The Second Discriminatory Write-Up constitutes disability discrimination.

189. The Second Discriminatory Write-Up constitutes race discrimination.

190. Defendants willfully engaged in the Second Discriminatory Write-Up.

191. Defendants intentionally engaged in the Second Discriminatory Write-Up.

192. The Second Discriminatory Write-Up was an adverse action.

193. The Second Discriminatory Write-Up was an adverse employment action.

13

194. Defendants engaged in the Second Discriminatory Write-Up with the intent to make Shelton quit.

195. The Second Discriminatory Write-Up created an unlawfully discriminatory hostile work environment.

196. The Second Discriminatory Write-Up contributed to an unlawfully discriminatory hostile work environment.

197. During Shelton's employment with Dollar Tree, Shelton's physician recommended that Shelton have surgery to remedy her Carpal Tunnel Syndrome.

198. The carpal tunnel surgery would render Shelton unable to work for at least three consecutive days.

199. The carpal tunnel surgery would require Shelton to receive continuing medical treatment during her period of incapacity.

200. Paragraphs 198 to 200 will be referred to collectively as Shelton's "Serious Health Condition."

201. In or about May 2023, before Shelton underwent the surgery, Shelton requested that she be able to work light duty until her surgery (Shelton's "Accommodation Request").

202. Shelton made her Accommodation Request to Karla Powell.

203. Powell was Shelton's supervisor.

204. Powell is not African American.

205. Powell is not disabled.

206. Shelton made her Accommodation Request to Kimberly Seifert.

207. Seifert was Shelton's supervisor.

208. Seifert is not African American.

209. Seifert is not disabled.

210. Shelton's Accommodation Request would not cause Defendants an undue hardship.

211. Before denying Shelton's Accommodation Request, Defendants did not determine whether Shelton's Accommodation Request would cause Defendants an undue hardship.

212. Defendants have no contemporaneously created documents reflecting any effort to determine whether Shelton's Accommodation Request would cause an undue hardship.

213. Before denying Shelton's Accommodation Request, Defendants did not determine the cost of Shelton's Accommodation Request.

214. Defendants have no contemporaneously created documents reflecting any effort to determine the cost of Shelton's Accommodation Request.

215. Before denying Shelton's Accommodation Request, Defendants did not determine the cost of providing any accommodation besides Shelton's Accommodation Request.

216. Defendants have no contemporaneously created documents reflecting any effort to determine the cost of providing any accommodation besides Shelton's Accommodation Request.

217. Defendants did not seek outside funding to cover the cost of any undue financial hardship.

218. Defendants have no contemporaneously created documents reflecting any effort to seek outside funding to cover the cost of any undue financial hardship.

219. Alternatively, Defendants did not offer Shelton the opportunity to pay for any financial hardship that would result from Shelton's Accommodation Request.

220. Shelton's Accommodation Request was reasonable.

221. Defendants did not engage in any conversation with Shelton for any alternative options for Shelton's Accommodation Request.

15

222. In response to Shelton's Accommodation Request, Defendants failed to participate in any interactive process.

223. Defendants denied Shelton's Accommodation Request.

224. Defendants did not provide Shelton's Accommodation Request.

225. Defendants did not provide Shelton with an alternative accommodation in response to Shelton's Accommodation Request.

226. Defendants did not provide Shelton with the opportunity to pay for any undue financial burden for a disability accommodation.

227. Defendants could have provided light duty as a reasonable accommodation.

228. Defendants have provided light duty to employees prior to Shelton's Accommodation Request.

229. Defendants did not provide Shelton with light duty.

230. During Shelton's employment, Defendants never explained to Shelton why the Accommodation Request was denied.

231. Alternatively, during Shelton's employment, Defendants only explanation to Shelton regarding why the Accommodation Request was denied was to say that Defendants did not have any accommodation available.

232. As a result of the Accommodation Request, Dollar Tree was aware that Shelton had a serious health condition.

233. As a result of the Accommodation Request, Dollar Tree was obligated to make Shelton aware of her rights under the Family and Medical Leave Act ("FMLA").

234. Dollar Tree is a covered employer under the FMLA.

235. As of May 2023, Shelton had worked for Dollar Tree for at least 12 months.

236. As of May 2023, Shelton had at least 1,250 hours of service for Dollar Tree during the previous 12 months.

237. At the time she made the Accommodation Request, Shelton qualified for FMLA leave in connection with her Serious Health Condition.

238. At the time she made the Accommodation Request, Shelton was eligible to utilize FMLA leave due to her Serious Health Condition.

239. At the time she made the Accommodation Request, Shelton was entitled to utilize FMLA leave due to her Serious Health Condition.

240. Following the Accommodation Request, Dollar Tree failed to inform Shelton of her FMLA rights.

241. In failing to inform Shelton of her FMLA rights, Dollar Tree interfered with Shelton's FMLA rights.

242. In or about May 2023, Shelton was in a meeting with other Dollar Tree employees, including Jaycob Frankenberry ("May Meeting").

243. Frankenberry is Caucasian.

244. During the May Meeting, the attendees noticed that John Wiggins, who was supposed to attend the meeting, had not yet arrived.

245. Wiggins is African American.

246. During the May Meeting, Frankenberry remarked to the employees at the meeting that "they used to put black people in zoos back in the day" ("Second Discriminatory Comment").

247. Frankenberry made the Second Discriminatory Comment knowing that Shelton was in the room.

248. The Second Discriminatory Comment was based on race.

17

249. The Second Discriminatory Comment was unwanted by Shelton.

250. Shelton opposed the Second Discriminatory Comment.

251. Shelton was embarrassed by the Second Discriminatory Comment.

252. Shelton was offended by the Second Discriminatory Comment.

253. A reasonable person would consider the Second Discriminatory Comment to be offensive.

254. The Second Discriminatory Comment was severe.

255. A reasonable person would consider the Second Discriminatory Comment to be severe.

256. The Second Discriminatory Comment was pervasive.

257. A reasonable person would consider the Second Discriminatory Comment to be pervasive.

258. The Second Discriminatory Comment is a violation of the Discrimination Policy.

259. Alternatively, the Second Discriminatory Comment is not a violation of the Discrimination Policy.

260. The Second Discriminatory Comment violates the Harassment Policy.

261. Alternatively, the Second Discriminatory Comment is not a violation of the Harassment Policy.

262. Alternatively, the Second Discriminatory Comment is permitted by Defendants.

263. The Second Discriminatory Comment constituted harassment.

264. The Second Discriminatory Comment created a hostile work environment based on race.

265. The Second Discriminatory Comment caused Shelton emotional distress.

266. The Second Discriminatory Comment is intolerable in a civilized society.

267. Alternatively, Defendants believe that Second Discriminatory Comment is tolerable in a civilized society.

268. Following the Second Discriminatory Comment, Shelton reported the Second Discriminatory Comment to Dollar Tree Human Resources personnel ("Second Report of Discrimination").

269. Shelton made the Second Report of Discrimination to Seifert.

270. In response to the Second Report of Discrimination, Defendants did not interview Shelton.

271. In response to the Second Report of Discrimination, Defendants did not interview Frankenberry.

272. In response to the Second Report of Discrimination, Defendants did not interview any witnesses.

273. In response to the Second Report of Discrimination, Defendants did not get a written statement from Shelton.

274. In response to the Second Report of Discrimination, Defendants did not get a written statement from Frankenberry.

275. In response to the Second Report of Discrimination, Defendants did not get a written statement from any witnesses.

276. In response to the Second Report of Discrimination, Defendants conducted no investigation whatsoever.

277. By failing to investigate the Second Report of Discrimination, Defendants ratified Frankenberry's conduct.

278. By failing to investigate the Second Report of Discrimination, Defendants allowed Frankenberry's conduct to continue.

279. Failing to investigate the Second Report of Discrimination is an adverse action.

280. Failing to investigate the Second Report of Discrimination is an adverse employment action.

281. Defendants willfully failed to investigate the Second Report of Discrimination.

282. Defendants intentionally failed to investigate the Second Report of Discrimination.

283. In response to the Second Report of Discrimination, Defendants did not correct the Second Discriminatory Comment.

284. In response to the Second Report of Discrimination, Defendants did not tell Shelton why they declined to correct the Second Discriminatory Comment.

285. In response to the Second Report of Discrimination, Defendants failed to discipline Frankenberry.

286. Following the Second Report of Discrimination, Defendants gave Frankenberry a promotion.

287. Following the Second Report of Discrimination, Hertz admitted to Shelton that the Second Discriminatory Comment was a terminable offense.

288. Following the Second Report of Discrimination, Hertz admitted to Shelton that the Frankenberry should have been disciplined for the Second Discriminatory Comment.

289. Defendants terminated Shelton's employment on August 15, 2023 ("Termination").

290. Defendants' stated basis for termination was that Shelton had engaged in "unprofessional behavior" ("Stated Basis for Termination").

291. Defendants have a progressive disciplinary policy.

292. Defendants used a progressive disciplinary policy.

293. Defendants used a progressive disciplinary policy for employees who are not African American.

294. Defendants used a progressive disciplinary policy for employees who are not disabled.

295. Under the progressive disciplinary policy, Shelton had not been given a verbal warning related to the Stated Basis for Termination.

20

296. Under the progressive disciplinary policy, Shelton had not been given a written warning related to the Stated Basis for Termination.

297. Under the progressive disciplinary policy, Shelton had not been given a final written warning related to the Stated Basis for Termination.

298. Under the progressive disciplinary policy, Shelton had not been given a suspension related to the Stated Basis for Termination.

299. Prior to terminating Shelton, Defendants never issued any written communication criticizing Shelton for any reason related to the Stated Basis for Termination.

300. The Stated Basis for Termination has no basis in fact.

301. The Stated Basis for Termination did not actually motivate Defendants' decision to terminate Shelton's employment.

302. The Stated Basis for Termination was insufficient to motivate the termination of Shelton's employment.

303. The Stated Basis for Termination was pretext to terminate Shelton's employment.

304. Defendants did not terminate similarly situated employees for a reason like the Stated Basis for Termination.

305. Defendants' termination of Shelton's employment was retaliation for her Reports of Discrimination.

306. Defendants' termination of Shelton's employment was retaliation for her FMLA Request.

307. Defendants terminated Shelton's employment because of Shelton's race.

308. Defendants terminated Shelton's employment because of Shelton's Disabilities.

309. By terminating Shelton's employment, Defendants made it less likely for a reasonable employee to make a report or oppose conduct like the First and Second Discriminatory Comments.

310. By terminating Shelton's employment, Defendants made it less likely for a reasonable employee to make a report or oppose conduct like the Emergency Stop Discipline.

311. The Termination constitutes retaliation.

312. The Termination constitutes race discrimination.

313. The Termination constitutes disability discrimination.

314. Defendants knowingly skipped progressive disciplinary steps in terminating Shelton's employment.

315. Defendants knowingly terminated Shelton's employment.

316. Defendants knowingly took adverse employment actions against Shelton.

317. Defendants knowingly took adverse actions against Shelton.

318. Defendants intentionally skipped progressive disciplinary steps in terminating Shelton's employment.

319. Defendants intentionally terminated Shelton's employment.

320. Defendants intentionally took adverse employment actions against Shelton.

321. Defendants intentionally took adverse actions against Shelton.

322. Defendants knew that skipping progressive disciplinary steps in terminating Shelton's employment would cause Shelton harm, including economic harm.

323. Defendants knew that terminating Shelton's employment would cause Shelton harm, including economic harm.

324. Defendants willfully skipped progressive disciplinary steps in terminating Shelton's employment.

325. Defendants willfully terminated Shelton's employment.

326. There was a causal connection between Shelton's race and the Termination.

327. There was a causal connection between Shelton's disability and the Termination.

328. As a result of Defendants' unlawful acts, Shelton has suffered, and will continue to suffer, pecuniary harm.

329. As a result of Defendants' unlawful acts, Shelton has suffered, and will continue to suffer, emotional distress.

## COUNT I: RACE DISCRIMINATION IN VIOLATION OF TITLE VII
### (Against Dollar Tree Only)

330. Shelton restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

331. Dollar Tree took adverse employment actions against Shelton based on Shelton's race.

332. Dollar Tree violated Title VII when they took adverse employment actions against Shelton based on Shelton's race.

333. Dollar Tree violated Title VII when they engaged in disparate treatment based on Shelton's race.

334. Shelton suffered damages as a proximate result of Dollar Tree's conduct based on Shelton's race.

335. As a direct and proximate result of Dollar Tree's race-based conduct, Shelton has suffered and will continue to suffer damages.

336. In discriminating against Shelton based on race, Dollar Tree acted with malice or reckless indifference to the rights of Shelton, thereby entitling Shelton to an award of punitive damages.

## COUNT II: RACE DISCRIMINATION IN VIOLATION OF R.C. § 4112.01 *et seq.*
### (Against Dollar Tree Only)

337. Shelton restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

338. Dollar Tree took adverse employment actions against Shelton based on Shelton's race.

339. Dollar Tree violated R.C. § 4112.02(A) when they took adverse employment actions against Shelton based on Shelton's race.

340. Dollar Tree violated R.C. § 4112.02(A) when they engaged in disparate treatment based on Shelton's race.

341. Shelton suffered damages as a proximate result of Dollar Tree's conduct based on Shelton's race.

342. As a direct and proximate result of Dollar Tree's race-based conduct, Shelton has suffered and will continue to suffer damages.

343. In discriminating against Shelton based on race, Dollar Tree acted with malice or reckless indifference to the rights of Shelton, thereby entitling Shelton to an award of punitive damages.

## COUNT III: DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA
### (Against Dollar Tree Only)

344. Shelton restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

345. Dollar Tree took adverse employment actions against Shelton based on Shelton's disability.

24

346. Dollar Tree violated the ADA when they took adverse employment actions against Shelton based on Shelton's disability.

347. Dollar Tree violated the ADA when they engaged in disparate treatment based on Shelton's disability.

348. Shelton suffered damages as a proximate result of Dollar Tree's conduct based on Shelton's disability.

349. As a direct and proximate result of Dollar Tree's disability-based conduct, Shelton has suffered and will continue to suffer damages.

350. In discriminating against Shelton based on her disability, Dollar Tree acted with malice or reckless indifference to the rights of Shelton, thereby entitling Shelton to an award of punitive damages.

**COUNT IV: DISABILITY DISCRIMINATION IN VIOLATION OF R.C. § 4112.01 *et seq.***
**(Against Dollar Tree Only)**

351. Shelton restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

352. Dollar Tree took adverse employment actions against Shelton based on Shelton's disability.

353. Dollar Tree violated R.C. § 4222.02(A) when they took adverse employment actions against Shelton based on Shelton's disability.

354. Dollar Tree violated R.C. § 4222.02(A) when they engaged in disparate treatment based on Shelton's disability.

355. Shelton suffered damages as a proximate result of Dollar Tree's conduct based on Shelton's disability.

356. As a direct and proximate result of Dollar Tree's disability-based conduct, Shelton has suffered and will continue to suffer damages.

357. In discriminating against Shelton based on disability, Dollar Tree acted with malice or reckless indifference to the rights of Shelton, thereby entitling Shelton to an award of punitive damages.

**COUNT V: DISABILITY DISCRIMINATION – FAILURE TO ACCOMMODATE IN VIOLATION OF THE ADA**
**(Against Dollar Tree Only)**

358. Shelton restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

359. As a result of Shelton's Disability, Shelton is and was considered disabled within the meaning of the ADA.

360. Dollar Tree violated the ADA when no one at engaged in an interactive process to find a reasonable accommodation for Shelton.

361. Dollar Tree violated the ADA when it did not provide a reasonable accommodation for Shelton.

362. Dollar Tree violated the ADA when it did not provide Shelton with the opportunity to pay for any undue financial burden for a disability accommodation.

363. As a direct and proximate result of Dollar Tree's failure to reasonably accommodate Shelton, Shelton suffered and will continue to suffer damages.

364. In refusing to accommodate Shelton, Dollar Tree acted with malice or reckless indifference to the rights of Shelton, thereby entitling Shelton to an award of punitive damages.

**COUNT VI: DISABILITY DISCRIMINATION – FAILURE TO ACCOMMODATE IN VIOLATION OF R.C. § 4112.01 *et seq.***
**(Against Dollar Tree Only)**

365. Shelton restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

366. As a result of Shelton's Disability, Shelton is and was considered disabled within the meaning of R.C. § 4112.01(A)(13).

367. Dollar Tree violated R.C. § 4112.01 *et seq.* when no one at engaged in an interactive process to find a reasonable accommodation for Shelton.

368. Dollar Tree violated R.C. § 4112.01 *et seq.* when it did not provide a reasonable accommodation for Shelton.

369. Dollar Tree violated the ADA when it did not provide Shelton with the opportunity to pay for any undue financial burden for a disability accommodation.

370. As a direct and proximate result of Dollar Tree's failure to reasonably accommodate Shelton, Shelton suffered and will continue to suffer damages.

371. In refusing to accommodate Shelton, Dollar Tree acted with malice or reckless indifference to the rights of Shelton, thereby entitling Shelton to an award of punitive damages.

## COUNT VII: RETALIATION IN VIOLATION OF TITLE VII AND THE ADA
### (Against Dollar Tree Only)

372. Shelton restates each and every prior paragraph of this complaint, as if it were fully restated herein.

373. As a result of the Dollar Tree's discriminatory conduct described above, Shelton complained about the perceived race discrimination Shelton was experiencing.

374. As a result of the Dollar Tree's discriminatory conduct described above, Shelton complained about the perceived disability discrimination Shelton was experiencing.

375. As a direct and proximate result to Dollar Tree's reporting of unlawful discrimination and harassment to Dollar Tree, Dollar Tree took adverse employment actions against Shelton.

376. As a direct and proximate result to Shelton's reporting of unlawful discrimination and harassment to Dollar Tree, Dollar Tree took adverse actions against Shelton.

377. As a direct and proximate result of Dollar Tree's retaliatory conduct against and termination of Shelton's employment, Shelton suffered and will continue to suffer damages.

378. In retaliating against Shelton, Dollar Tree acted with malice or reckless indifference to the rights of Shelton, thereby entitling Shelton to an award of punitive damages.

## COUNT VIII: RETALIATION IN VIOLATION OF R.C. § 4112.02(I)
### (Against Dollar Tree Only)

379. Shelton restates each and every prior paragraph of this complaint, as if it were fully restated herein.

380. As a result of the Dollar Tree's discriminatory conduct described above, Shelton complained about the perceived race discrimination Shelton was experiencing.

381. As a result of the Dollar Tree's discriminatory conduct described above, Shelton complained about the perceived disability discrimination Shelton was experiencing.

382. As a direct and proximate result to Shelton's reporting of unlawful discrimination and harassment to Dollar Tree, Dollar Tree took adverse employment actions against Shelton.

383. As a direct and proximate result to Shelton's reporting of unlawful discrimination and harassment to Dollar Tree, Dollar Tree took adverse actions against Shelton.

384. Pursuant to R.C. §4112.02(I), it is an unlawful discriminatory practice "to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section…"

385. As a direct and proximate result of Dollar Tree's retaliatory conduct against and termination of Shelton's employment, Shelton suffered and will continue to suffer damages.

386. In retaliating against Shelton, Dollar Tree acted with malice or reckless indifference to the rights of Shelton, thereby entitling Shelton to an award of punitive damages.

## COUNT IX: UNLAWFUL INTERFERENCE WITH FMLA RIGHTS
### (Against Dollar Tree Only)

387. Shelton restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

388. Pursuant to 29 U.S.C. § 2601 *et seq*., covered employers are required to provide employees job-protected unpaid leave for qualified medical and family situations.

389. Dollar Tree is a covered employer under FMLA.

390. During her employment, Shelton qualified for FMLA leave.

391. During her employment, Shelton attempted to request FMLA leave by asking Dollar Tree if she qualified to take FMLA leave.

392. Dollar Tree failed to properly advise Shelton of her rights under FMLA.

393. Dollar Tree unlawfully interfered with Shelton's exercise of her rights under FMLA in violation of Section 105 of FMLA and section 825.220 of FMLA regulations.

394. Dollar Tree's act of writing Shelton up during her FMLA leave violated and interfered with Shelton's FMLA rights.

395. Dollar Tree violated section 825.300(c)(1) of FMLA and interfered with Shelton 's FMLA rights when Dollar Tree did not honor Shelton's approved use of FMLA leave.

396. As a direct and proximate result of Dollar Tree's conduct, Shelton is entitled to all damages provided for in 29 U.S.C. § 2617, including liquidated damages, costs, and reasonable attorney's fees.

## COUNT X: RETALIATION IN VIOLATION OF FMLA
### (Against Dollar Tree Only)

397. Shelton restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

398. During her employment, Shelton utilized FMLA leave.

399. After Shelton utilized her qualified FMLA leave, Dollar Tree retaliated against her.

400. Dollar Tree retaliated against Shelton by terminating her employment.

401. Dollar Tree willfully retaliated against Shelton in violation of 29 U.S.C. § 2615(a).

402. As a direct and proximate result of Dollar Tree's wrongful conduct, Shelton is entitled to all damages provided for in 29 U.S.C. § 2617, including liquidated damages, costs, and reasonable attorney's fees.

## COUNT XI: UNLAWFUL AIDING, ABETTING, AND INCITING OF DISCRIMINATION
### (Against Powell and Hertz)

403. Shelton restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

404. Pursuant to R.C. § 4112.02(J), it is unlawful "[f]or any person to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice..."

405. Powell aided, abetted, incited, coerced, and/or compelled Dollar Tree's discriminatory adverse employment actions against Shelton.

406. Hertz aided, abetted, incited, coerced, and/or compelled Dollar Tree's discriminatory adverse employment actions against Shelton.

407. Powell aided, abetted, incited, coerced, and/or compelled Dollar Tree's discriminatory treatment of Shelton.

408. Hertz aided, abetted, incited, coerced, and/or compelled Dollar Tree's discriminatory treatment of Shelton.

409. Powell violated R.C. § 4112.02(J) by aiding, abetting and inciting discrimination.

410. Hertz violated R.C. § 4112.02(J) by aiding, abetting and inciting discrimination.

411. Shelton suffered emotional distress as a result of Defendants' conduct, and is entitled emotional distress damages pursuant to R.C. § 4112.01 et seq.

412. As a direct and proximate result of Defendants' conduct, Shelton has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

413. In aiding, abetting and inciting discrimination against Shelton based on race, Defendants acted with malice or reckless indifference to the rights of Shelton, thereby entitling Shelton to an award of punitive damages.

### **DEMAND FOR RELIEF**

WHEREFORE, Jacqulyne Shelton demands from Defendants the following:

(a) Issue a permanent injunction:

   (i)     Requiring Dollar Tree to abolish discrimination, harassment, and retaliation;

   (ii)    Requiring allocation of significant funding and trained staff to implement all changes within two years;

   (iii)   Requiring removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and failed to meet their legal responsibility to promptly investigate complaints and/or take effective action to stop and deter prohibited personnel practices against employees;

   (iv)    Creating a process for the prompt investigation of discrimination, harassment, or retaliation complaints; and

(v)     Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

(b) An award against each Defendant of compensatory and monetary damages to compensate Shelton for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in excess of $25,000 per claim to be proven at trial;

(c) An award of punitive damages against each Defendant in excess of $25,000;

(d) An award of reasonable attorneys' fees and non-taxable costs for Shelton claims as allowable under law;

(e) An award of the taxable costs of this action; and

(f) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

*/s/ Trisha Breedlove*
Trisha Breedlove (0095852)
**SPITZ, THE EMPLOYEE'S LAW FIRM**
1103 Schrock Road, Suite 307
Columbus, Ohio 43229
Phone: (614) 683-7331
Fax:    (216) 291-5744
Email: trisha.breedlove@spitzlawfirm.com

*Attorney For Plaintiff Jacquelyne Shelton*

## JURY DEMAND

Plaintiff Jacqulyne Shelton demands a trial by jury by the maximum number of jurors permitted.

*/s/ Trisha Breedlove*
Trisha Breedlove (0095852)